Thank you. Madam Clerk, please call the first case. Case 13-140, Karnes v. State Tree Service. You may proceed. Good morning, Your Honors. My pleasure to be here before you today in this beautiful courtroom. This case is an important one for my client. He's a 17-year tree trimmer for Wright Tree Service. The important thing... Counsel, what's your name? Phil O'Donnell, Your Honors. I apologize. That's all right. This case involves, essentially, an elbow condition that was fairly minor and insignificant, but a very disputed left shoulder condition that first was treated by my client with medical care about five months after he noticed an initial incident. When you read the transcript in this case, you'll see that he worked in the field on a tree trimming crew and had for about 15 years. Back in the fall of 2006, he was up in a bucket on the crew with his foreman, a man named Kevin Ketchmark, with whom he'd worked with intermittently. He was a field supervisor for Wright Tree Service. He had his left arm out, sawing a big heavy log tree up in the air above some three-phase lines. Felt a pop in his shoulder. Counsel, I think we're fairly familiar with the facts, but I would note in reviewing the record, apparently the arbitrator found that your client was not a credible witness. So what's your response to that? Your Honor, if I may, the conclusion in the findings of fact and the determination by the arbitrator in the arbitrator's decision regarding the October incident, which is where he felt the pop, says there are no records. The conclusion, the finding of fact in the record, is totally erroneous, Your Honor. And, of course, as Your Honor will remember... Who makes the findings of fact that it's totally erroneous? I mean, isn't that within the purview of the commission? Your Honor, the commission... Were you basing that assertion on? If I may, Your Honor, the arbitrator's finding of fact that there was no medical records to support any injury in October relied upon one record of a family physician my client went to because he thought that was the employer's doctor because they'd sent him there for prior work physical. There are six other histories provided in that month when he started his treatment, six histories to six separate providers that say specifically what happened, that he felt a pop and for the next five months continued to work, gradually the pain worsening to the point where he sought medical care about five and a half months later. Why did he give notice to his employer that he sustained a work-related injury? Your Honor, at trial, the corporate management employee for Wright Tree Service testified. He testified he didn't remember any notice being given to him in the fall. He did testify that a work injury was reported to him in April of 07 and he immediately then took the petitioner to OSF rehab. How long after the injury or Ludd's injury was April of 07? Wasn't that months later? He sought care about five and a half months later. And I think it's important in this case to know, Your Honor, this is tree trimming work. My client's testimony was very specific. It goes, we get aches, pains, strains all the time. When I felt this pop in my shoulder and told my foreman about it in the field, I didn't think much of it. Gradually it got worse. As to the determination here of credibility, Your Honor, what I would like to submit to the Court is when we have six histories that say the same exact thing to two physiatrists, a pain specialist, an orthopedic surgeon, and a physical therapy, they all say the same thing. And those are all in the first month of care, Your Honor. When did he go for care the first time? He first went for care on April 7th of 2007. For an injury that allegedly occurred in October of 06. The commission made certain findings. They believed McMillan when he testified that your guy never reported an injury to him in October. Now, that's a he said, he said. And the commission said, we don't believe it. They turned around and said, you will let you get injured in April or in October, but you don't go for medical treatment until October. Your Honor, if I may, I agree with you. And that's the reason we filed the second case, because when you look at these records in April, starting in April when he got his treatment, the diagnosis is two things. They do an MRI within two weeks. It shows a subscapularis tendon, partial tear. All the physicians, Dr. Hoffman, the one who first charted these problems, had been here about a month or so in the elbow and the shoulder, and then Dr. Howard, pain specialist, the orthopedic surgeon, Dr. Lane, and as well as Dr. Moody, who was the OSF rehab doctor, they all said the same thing. He developed an impingement syndrome. The impingement syndrome, if you read Dr. Lane's deposition. Wait a minute. I don't think anyone disputes the fact he's hurt. What they're disputing the fact is that it occurred out in the course of his employment. Well. They don't believe him. I mean, this is what this boils down to. The whole case is they don't believe the man. They don't believe he was ever injured at work in October of 2006. I don't think they turned around and said, we don't think he's hurt. Your Honor, and that's the reason we have two cases filed. The conclusion in the second case is that he reported only an elbow injury. There is no testimony to that effect. The foreman testified in April of 2007 he came to and reported a work injury. The question for the two consolidated cases is very clear, and that is, in the first case, when the arbitrator concludes there are no records that show an October of 2006 injury, the arbitrator relied upon one record, only one, and ignored six other records that said exactly the same thing. In the second case, Your Honor. Hold on a second. What records do you rely on to establish there was actually an injury in 06? The histories he gave to his treating physicians in April? That's no evidence. He sought no care, Your Honor, and I agree. He's a treater. These are mean, tough guys. No, I understand that. But what I'm saying is, what records are there that would support his notion that there was actually an injury way back in October, other than his statements of history given to treating physicians come April? Your Honor, I agree with you. There are six separate physicians and a physical therapist and a radiologist. Dr. Moody, Dr. Scott, the physical therapist, the pain specialist, they all took histories. Even at the radiology office. Where did they get the histories? They're getting it from him. Okay. So he says it happened. McMillan says you never reported it to me. You never go for treatment until April, and the commission says we don't believe him. In the first case, Your Honor. In the second case, there was stipulation that there was a work injury reported, and a manifestation date. If you read the case law manifestation date, the case law says a manifestation date of the injury can be when the patient, the employee appreciates the medical condition requires care. I cited the Duran decision in my brief. There's a variety of case law that suggests and makes clear that when does the employee know he has an injury? It's when he goes out and seeks care. I agree. He waited. He tried to tough it out here. The arbitrator's decision, though, is, of course, a rubber stamp of what the defense attorney wrote up. The commission made no independent analysis here. It's just a rubber stamp of the commission. They just say we adopt the arbitrator's findings. There was no further discussion. So what's your explanation for the delay? He's a tough guy. He's a mean, tough guy, I believe you said, so, therefore, if he waits five months, that's always okay. I don't suggest it's always okay. What he testified to very clearly is that he gets strains, pushes, pulls, this is really hard work, and it gradually got worse to the point where he finally sought care five and a half months later because at that point, a couple months into that, his elbows started to bother him, probably because he was compensating without his left shoulder being able to really use it. Now, what was diagnosed? Yeah, the MRI diagnosed a tear. It also diagnosed a clinical impingement syndrome, which his orthopedic surgeon, the OSF physician that Wright took him to in April, diagnosed an impingement syndrome. Pain specialist who he was referred to by the orthopedic surgeon diagnosed an impingement syndrome. And what do we have? We have a case where there is no other history of how this man's clinical impingement syndrome developed other than his work, and that's the reason we filed two cases, because early on they told us our field, our traveling management corporate employee, he doesn't remember this. That's the reason I subpoenaed in his crew supervisor, Mr. Ketchmark, who was not deemed not credible by the arbitrator with regard to the October incident. And when you have an arbitrator that doesn't make an independent write-up of their findings and they just take the arbitrator's decision that's written by the defense counsel, you have to, Your Honors, in this case, look very closely at the statement in the records that says there are no medical records to support an October injury. That's just ignoring the six records that are there from six separate providers besides the family doctor said he has an elbow and a shoulder injury, he's been here about a month, and that would go back to March. The question is manifestation with regard to our second case. He manifested, he got to the point where he sought care. Mr. O'Donnell? Yes. Dr. Hoffman, I think you indicated in your brief that his notation of April the 7th of 2007 that the shoulder pain started at about the same time as the elbow pain was an unintentional error, a charting error. Did Dr. Hoffman ever acknowledge error in that charting? We did not depose Dr. Hoffman. We thought that based upon the six other records from all very learned, more specialized physicians, Dr. Hoffman is a sports physicals, he's an internal medicine physician in Peoria, he sees everybody that comes into his office, and he sees them fast. Your Honors would not be aware of that. But he sees a physiatrist who's, he sees a physiatrist two days after he sees Hoffman that his corporate management foreman takes him to, and a very clear history is given. Now, the arbitrator did penalize this man for waiting to get care. This is very, very hard work, Your Honors, and I would submit that though he did wait five and a half months to get care, that is not an unreasonable decision. When you've seen, he worked in this position 17, 18 years before this incident. This isn't a case where you have six, seven complicated different histories. Every history he gave initially is the same. But what's most important in this case is if the arbitrator says he's not credible, the arbitrator's saying that by looking at one record from someone who is not an orthopedist, who's not a surgeon, who's not a pain specialist, and doesn't necessarily have a lot of time in a practice to take very extensive history. All it says is he was dragging some wires, he experienced onset of pain in his shoulder and a pain in his elbow. This was March. He's had pain since. We know from looking at all the other records that's not the history. Now, what's important here is that I have to convince you that there's a disregard of the manifest way to the evidence. And, Your Honors, when the conclusion is that there are no records that even state there's an initial incident where he fell to pot, that's the conclusion of the arbitrator that he adopted. Now, it's a lot easier in these cases to adopt a short decision and not a decision where a man lost his job because this employer doesn't provide light duty and he's been off work for 90 weeks. By the time we can get the case to trial, which is what we had. So you have a disputed amount of TTD. You have a disputed surgery. Notably, Your Honors, the last history given, a year after the first history, is when they sent him to their IME, Dr. Wadowa, who's an orthopedic surgeon in Springfield, a learned fellow. The history is exactly the same. It gradually, his shoulder got worse over five and a half months and he finally did decide to seek care. Dr. Wadowa says, yep, he's got an impingement syndrome and he's got a partial tear of his subscapular tendon in the backside of his scapula. Now, the dispute that caused a denial in this case was that Dr. Wadowa says, this is not a condition you can operate on. Very serious problem for my client because he cannot go back to this job. They gave him three weeks of light duty. Now, they're saying there's no notice, Your Honors, and what's important in the record to note, Mr. McMillan acknowledges that the day Mark told him he went to the doctor about his work injury, in April when he told him about it, he took him there. He gives him a 20-pound restriction for no overhead work for his left arm. The arbitrator, in the second decision, concludes there is no indication of any shoulder injury whatsoever. That is inconsistent with the testimony. Mr. Carnes testified he reported this injury to the shoulder and the elbow and because his elbow had now been bothering him, he decided I'd better go get to the doctor. I would ask the court to not penalize Mr. Carnes for grinning and bearing his pain. It's undisputed here that what he did for five and a half months after this initial incident was the same full-duty work. These guys know that if you miss work for more than 12 weeks, the IBDW contract with Wright says you're out the door, you're done. He has an incentive to do his work and stay at the job as long as he can. I would submit, Your Honor, to all the court, to the panel, that here the arbitrator's decision was an easy thing to do. It's just to say, oh, there's an old history, it's five and a half months old, but if we look at the charting and we look at what we have for notice, the arbitrator's decision in the first case said, oh, notice this claim to Mr. McMillan. Corporate Traveling Field Managers for Wright, it paid a bonus if they don't have work comp claims. But the crew supervisor that he's working with that day, Ketchmark, testified he was not found uncredible, incredible. And for what it's worth, Your Honor, Mr. Ketchmark is his supervisor. We've cited the cases that go back to like 1918. Notice to a foreman is sufficient. It doesn't have to be the corporate management employee. Now, in the second case, Your Honors, we filed a second case because they say, well, we dispute notice, Mr. McMillan doesn't remember this. What does he have? He has impingement syndrome. It's very important in this case, there are no other suggestions of a causal relationship of the shoulder condition. Once he was taken off work, his elbow went away. This case isn't about the elbow. It was very convenient drafting by defense counsel to say, oh, with regard to the second report, we just have an elbow injury. But if you read this transcript, Mr. McMillan doesn't testify, nor does the petitioner, that an elbow-only injury was reported. I asked for the first report of injury at the trial, and defense counsel couldn't provide it for the April report. So we don't know. We don't know what it says. It wasn't our evidence. They're supposed to have a first report of injury, say it was reported, oh, we don't have it. But Mr. McMillan, who is arbitrarily relied upon, a corporate foreman, travels around these job sites and looks in on these fellows from time to time, says he reported to me an April 7 work injury, and I took him to work, and then he brings me no overhead work in the left shoulder, a 20-pound weight restriction. And the arbitrator concluded there's no report of a shoulder injury. That's entirely inconsistent with the records. In the first instance here, the conclusion is notice. They say I claim notice to Mr. McMillan. We did. We put that in our act. We also, at trial, subpoenaed in this fellow, Ketchmark, who had not even been a Wright employee for the better part of three years by the time we got to trial. And, in fact, testified he didn't know what month it was. He knew it was in the fall. He knew the guy came down from the bucket and told him he hurt his shoulder. That was not disputed. So when you couple that finding with the finding of the arbitrator, drafted by defense counsel, that there are no records that even suggest there is an October injury, no records. The finding made by the arbitrator on notice is against the manifest weight. There was nothing for the arbitrator to conclude, Your Honor, that Mr. Carnes was not credible. He said the same thing to all these physicians. Counsel, your time is up. Thank you. You'll have time to reply. Excuse me. Counsel, you may respond. May I proceed, Your Honors? You may. My name is Noah Hammond. May it please the Court, Counsel, I'm with the law firm Brady, Conley, and Masuda, represent the appellee in this case, Wright Tree Services. Can you say your name again? Noah Hammond, Your Honor. Thank you. Certainly it's my client's position that the lower court's findings are not against the manifest weight of the evidence and that there is sufficient evidence to support that. Moreover, I'd like to point out that the employer in this case wanted arbitration, one at the commission level in the unanimous decision, and then one in circuit court as well. So it's been consistent throughout the life of this case. His position is that the arbitrator's findings have been rubber-stamped. He's strung on the gauntlet. He's hanging his hat on perhaps to only read, but he can hang it on, and that is he's challenging the finding that there are no, quote, unquote, medical records to support the claimant's position. He's referencing all of these reports, all the things that the claimant said to these doctors, albeit months later. So is it true there's absolutely no medical reports to support his position? My client points to the fact that the arbitrator cited many reasons for his determination in his findings of fact. Yes, he said there was no evidence of a 2006 accident, and I would maintain that that is accurate. Why is that accurate? With regard to the timeframe between October 2006 to April 2007, there's no medical there. He did later state in the histories from April of 2007 on that there was a 2006 accident history. When did he first seek treatment? In April of 2007? April 7, 2007. Did he report at that time that the injury was work-related? In the initial treatment record, that was Dr. Hoffman, April 7, 2007. He did not report the 2006 tree-trimming incident. He later, when he went to OSF April 10, in all records thereafter, he did report the 2006. So April 10, he reported it was connected to work. That's correct, Your Honor. Okay. And my client would point out again that large gap in time, that roughly six-month period from October 2006 to April 2007. If he was in pain, I understand counsel's arguing that, you know, this is a tough guy, and he would have toughed it out. But it stands to reason that if you're in pain, you seek some kind of medical treatment. So there was no report to the company in October? That I don't have that information, Your Honor, is certainly not within the record. Okay. With regard to the first treatment record with Dr. Hoffman, because the arbitrator does reference that in his findings of fact, it's my client's position that that record is significant. That's the very first treatment record of any kind. So some importance should be placed on that record. That's the very first history out of this injured worker's mouth. What does he say? No mention of a 2006 accident. Moreover, this is a doctor that was picked by the injured worker. So this isn't a doctor that can be discredited. He's not an IME physician. This is the injured worker's choice. And that initial treatment record, there's no mention of it. How did he come up with Dr. Hoffman? I believe, I'm not sure, Your Honor. I don't believe the record really gets into much detail about how Dr. Hoffman was his choice. Later, the petitioner went to OSF on April 10th, and that was the company's doctor, Dr. Hoffman. I'm not sure, Your Honor. Okay. Again, with regard to the six-month gap, I'd like the court to consider this man's MRI findings from April 27th, 2007. It was a partial thickness tear of the subscapularis tendon, bursitis, osteochondritis. This individual wants us all to believe he just pushed through that pain for a six-month period of time, that he's that tough. Consider his job duties. He's a tree trimmer. He testified that he's 30, 40 feet in the air in a bucket in a truck. He's holding tree branches and chainsawing with his other arm. Very labor-intensive work. He testified that he would drag the branches after they were cut and put them into the tree trimmer. Very labor-intensive work. If he was having pain, and I understand counsel maintains this is a gradual onset, I find that hard to believe. I believe if there was a 2006 injury, there would be some kind of indication in the medical records he would have sought medical care. The arbitrator also, in addition to pointing out the lack of any kind of treatment within that six-month period of time, goes further to discuss Kevin Ketchmark. And while he might not specifically say Kevin Ketchmark is not credible, he says Dan McMillan is credible. The two had differing testimonies. So by implication, my client would argue that Kevin Ketchmark was found not credible by the arbitrator. And Kevin Ketchmark was not credible because he was paid to be there. His mileage expenses were paid. He is a friend of the injured worker. There's testimony to that effect. They hung out socially together. They were drinking buddies or at least went to a bar a few times together. There's a social relationship there. Mr. Ketchmark's testimony also is not specific. He can't tell you the date this happened. He can't tell you where they were when this happened. He just says, oh, yeah, I seem to recall the injured worker telling me this. My question is where would other witnesses be then? Testimony was from the injured worker that he had a girlfriend, he had a mother that he lived with. Where were these individuals with their testimony to talk about, yes, Mr. Carnes came home every day saying, oh, my arm hurts and it's all related to this 2006 accident. The only witness we have is Kevin Ketchmark. And he has some credibility issues, as were pointed out by the arbitrator. How large is the crew, the tree trimming crew? It varied. I believe there's testimony from Dan McMillan that he supervised 10 to 12 people. I think depending on the size of the job, there could be more. So there are more than one person on the job site. That's correct. Dan McMillan was found specifically credible by the arbitrator, and that is the employer's witness in this case. He was found credible for several reasons. Chiefly, he did timely report the 2007 incident. We're not disputing notice there in 2007 when Mr. Carnes went to Mr. McMillan and said, I'm having pain. So they gave him light duty, right? They gave him light duty, and they immediately- For three weeks. Yes, Your Honor, and they also gave him medical care. So if that was done in 2007, why wouldn't it have been done in 2006? It just doesn't stand to reason that an employer would- Counsel is saying something like there's 12 weeks. After 12 weeks, according to an IDEW contract, you're no longer employed. I believe the testimony about that is if you're missing work without any excuse. I believe that workers' compensation cases where you're being paid TTD, where you have a legitimate work injury, that- Okay, and there is a history in this record of them offering light duty. That is correct, Your Honor. And the light duty restrictions would not go into that 12-week provision of the contract, right? Again, Your Honor, I'm limited- Does the record show anything about that? I don't believe the record does give it very much detail, but it stands to reason, generally speaking, that it's against public policy to terminate somebody for having a workers' compensation injury. With regard to Mr. McMillan's testimony, again, it's his position that no accident was reported in 2006. And just to finish that point, again, that seems to make sense, because when a 2007 incident was reported to Mr. McMillan, the company gave him medical care. The company gave him light duty work. The company acknowledged the accident. This wasn't done in 2006, which lends credibility to Mr. McMillan's position. So in your opinion, there's evidence in the record to support the Commission's findings? That's correct, Your Honor. That's correct, Your Honor. And just to address a point made by my opponent with regard to the 2007 accident, the 2007 accident, or incident, I should say, isn't specific. There's no event. It's basically his argument that his injuries came to a boiling point, his 2006 injuries, that is, came to a boiling point in 2007 to the point that he needed to seek medical care. So if we're going to investigate whether that's true, we have to then again look at the 2006 arguments I just made. The two are interwoven here. So his argument that because something was reported in 2007, because they were aware of an accident, it's all tied up with a neat bow and we have causation and we have accident, that's simply not the case. We concede that something was reported in 2007, but the burden of proof is still on the injured worker, Mr. Carnes, to prove accident, to prove causation, to prove all the other issues that are in dispute. Doesn't Dr. Hoffman's treatment record of April the 7th contain a history, which he contends the petitioner gave him, of an onset of pain in the left shoulder that popped and pain in the right elbow in early March? That's correct, Your Honor. So there is a history of when this started. It started March of 07, according to that treatment note. And that's the only treatment note that has that history. In the April 10th OSF record, he specifically states no describable cause of symptoms. I wish there was more testimony about this April incident, but the testimony that is there, which is all we have to go on, is that Mr. Carnes is alleging a gradual onset of the 2006 incident. There's no additional testimony about this tree trimming incident that's referenced in Dr. Hoffman's April 7th treatment record. Instead, the overwhelming evidence seems to indicate that in April of 07, his 06 injuries had become so severe that he needed treatment. Well, what did McMillan testify that he was told in April of 07? There really isn't a lot of testimony about what was specifically said, other than symptoms were reported. Mr. Carnes was saying he had pain. Pain where?  But again, to that point, it's my client's contention that there's no, even though something was reported in April of 07 with regard to the left shoulder and the right elbow, we don't have that causal link dating back to 2006, and there's no precipitating event in April of 07. This all, according to Mr. Carnes, relates back to 06, as burden of proof hasn't been met with regard to the 06 accident. At this point, Your Honors, I would argue that the decisions of the lower courts were not against the manifest weight of the evidence, that there is a sufficient basis for the lower court's decision. I'd rely on my brief at this time. You have to be very careful, because we're not reviewing the lower court's decision. We're reviewing the board's decision, so be very careful as to what you say, where the decision is being made. We don't really care what the lower court did, other than it is a judgment line and an order that we've got to review. Thank you, Your Honor. I misspoke. Thank you. So I'd rely on my brief at this time, and I'd welcome any questions. I don't believe there are. Thank you, Counsel. Thank you. Counsel, you may reply. Your Honors, the point and purpose of Section 6C of the Act in a case involving notice is that the respondent has to show prejudice. They can't show prejudice here. You heard from their counsel that this is the case. He doesn't have to show prejudice if there was no notice. He only has to show prejudice if there was inadequate notice. He claims there was none at all. And that conclusion is a lie. Based on McMillan saying the guy never told me a thing in October. Correct. McMillan said that. And your client said he did. And Mr. Ketchmark also testified. Ketchmark comes a little bit later. Your client's testimony is, I told McMillan. And my client's testimony also was, I came down out of the bucket that day, and my crew foreman on the ground was Kevin Ketchmark, and I told him right then. Ketchmark said within a couple days, McMillan came to the job. He did know how many days later he came to the job, and he heard Mr. Carnes tell him about it. Do they have a reporting requirement for on-the-job injuries to this company? They do. Did Ketchmark fill out any reports on the day of this injury in October? Your Honor? That would be a yes or a no. Mr. Ketchmark did not. But the corporate management traveling field crew foreman, Mr. McMillan, testified their procedure is to not prepare any reports and to not make a report to the insurance company unless medical care was sought and obtained. And I will submit to this Court that there is no prejudice when the man doesn't seek care. He sought care finally. I think this little is funny. As you can understand, the Commission just didn't believe Ketchmark, and they didn't believe your client. They believed McMillan that he was never taught and no injury ever took place. Now you've got to tell me why that's against the manifest way of the evidence when he never went for medical treatment until April. Because the arbitrator never read these records, Your Honor. The arbitrator, to make a conclusion that the attorney writes up and says there are no records to see. Wait a minute. Counsel, the attorney writes them up in all the cases. I agree. When you win, you write them up. I agree. When he wins, he writes them up. And I write them up. So, I mean, there's nothing to that. And I write them up to reflect the content of the records. Now, to say there are no records that support an injury ignores all the records except for one that said it started in March. And what is the prejudice they can show when he waits five and a half months and comes and tells them, look, my shoulder is bothering me and my elbow is bothering me. McMillan never said, oh, he only told me about an elbow. If the Commission believed he actually told Ketchmark, you'd be right. They didn't believe him. Your Honor, in this case. They just didn't believe him. In this case, this Court could affirm that decision regarding the fall of 6 October incident for which no treatment was sought. But this Court has to reverse the Commission's ruling. Be very careful as to what we have to do. I believe when we look at all the evidence and we assess the manifest weight standard and say the opposite conclusion is clearly apparent that he had a shoulder injury. You have an arbitrator writing a report or a decision that says there's no records about this initial incident. We know that. I don't think there's any question this guy's got a shoulder injury. Right. And I think as one of the doctors testified to, he's a weightlifter. No. The doctor didn't say that. The doctor was asked by defense counsel, is he lifting weights? Mr. Karm's very specific testimony was when they sent me to OSF rehab, they had me lift very light weights and they gave me a TENS unit. And that is his testimony. The only evidence there is about lifting weights is Dr. besides Petitioner's claim is the record. The record says he was on a weight program to improve his shoulder. That's very clear. Dr. Lane said, I don't know anything about lifting weights. Now, what this court has to consider is that in April and May and June of 2007, he's at OSF rehab where the employer took him, and they're having him lift some weights as a part of therapy. Conservative treatment always comes first. It wasn't until 2008 where Dr. Lane tells him, look, you're not getting any better. You need a surgery. And that's where this case boiled over to the trial for the 19B. It's very clear he was lifting weights in therapy. And as Petitioner testified, they also gave him a TENS unit. There is no independent weight lifting at home. There's no evidence of that in the record at all. Now, this assertion about Ketchmark not being credible, oh, because we paid him a mileage fee, I called the guy up. Hey, are you coming? No. I sent him a subpoena. We paid him the witness fee. Did Lane or did not Lane testify that plaintiff told him he'd been working out with weights, and then Lane said it's an activity which would have contributed any impingement syndrome to the left shoulder? Did he testify to that? That was the question by the defense attorney asking him that question because he's been working out with weights. What did Lane say? He said yes. And that's in the therapy. That's in the therapy. So in other words, in therapy, they give him things that make his condition worse? It's very common, Your Honor, for any type of soft tissue injury for them to put him through weights. I had Mr. Carnes testify on that because that point had come up in Dr. Lane's deposition before trial. I had to file a petition for Detimus to even force the deposition Dr. Lane because they wouldn't even agree to set Dr. Lane's deposition. The weight lifting he was doing was in the therapy, and they do have weights lifted in therapy. That's very common for soft tissue type injuries. As the petitioner testified, it was light weights. Now, to say Ketchmark has bad credibility, going back to the fall report, we had to pay him a subpoena fee and we had to pay him his miles, go down by St. Louis somewhere to suggest that we bribed him or somehow encouraged his testimony or encouraged him to come. We had to have him come. And the reason we had to have him come. Didn't you have to pay subpoena fees to anybody to testify? Aren't you supposed to? You have to. You have to subpoena him to testify. You have to. He wouldn't come. He was working for you. He said he wouldn't come. He told me that on the phone before trial. He said he wouldn't come. Is that in the record that he told you he wouldn't come? No. Not in the record. Counsel, your time is up. Thank you. I would ask the commission, ask the court to review both decisions and pay very close attention to the April findings. Thank you, counsel. Thank you. Counsel, both this matter will be taken under advisement and this position shall issue.